# PLAINTIFF'S EXHIBIT 2

### Excerpts From The Transcript of
### The Deposition of Daniel Gervais,
### (August 21, 2014)

---

*In The Case Of*

**Carrie Couser, On Behalf of Herself and All Others Similarly Situated**

*v.*

**Comenity Bank et al.**

**3:12-CV-02484-MMA-BGS**

1           IN THE UNITED STATES DISTRICT COURT

2       FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4   CARRIE COUSER, INDIVIDUALLY

5   AND ON BEHALF OF ALL OTHERS

6   SIMILARLY SITUATED,

7               Plaintiffs,

8       vs.                    Case No.

9   COMENITY BANK,             3:12-CV-02484-MMA-BGS

10              Defendant.     VOLUME II

11  _____

12

13

14

15      Continued Deposition of DANIEL GERVAIS,

16      taken at 41 South High Street, Columbus,

17      Ohio, commencing at 10:04 a.m., Thursday,

18      August 21, 2014, before Rebecca Williams,

19      RPR, Notary Public.

20

21

22

23

24  JOB No. 1885285

25  PAGES 57 - 93

                                    Page 57

Exhibit 2

1          DANIEL GERVAIS, of lawful age, called for

2     examination, as provided by the Ohio Rules of

3     Civil Procedure, being by me first duly sworn,

4     as hereinafter certified, deposed and said as

5     follows:

6               EXAMINATION OF DANIEL GERVAIS

7     BY MR. KAZEROUNIAN:

8          Q.    Good morning, Mr. Gervais.

9          A.    Good morning.

10         Q.    Can you state your full name and        10:04:11

11    spell it for the record, please.

12         A.    Yes.  Daniel Robert Gervais, first

13    name, D-A-N-I-E-L, Robert, R-O-B-E-R-T,

14    G-E-R-V-A-I-S.

15         Q.    Okay.  Mr. Gervais, we've met          10:04:31

16    before.  I took your deposition in this very

17    same room in January of this year; is that

18    correct?

19         A.    Correct.

20         Q.    Okay.  So, at that point, I think,     10:04:40

21    that was your first ever deposition, if I'm not

22    wrong; is that right?

23         A.    Yes.

24         Q.    So between that time and this time,

25    have you had any other depositions taken of       10:04:49

                                                    Page 61

Exhibit 2

1    you?

2         A.    No.

3         Q.    Okay.  So this means that this is

4    your second deposition?

5         A.    Yes, sir.                          10:04:55

6         Q.    Just -- I'm sure Mr. Kaminski, your

7    counsel, has been over the rules again, but

8    since it's only your second depo, I'll just go

9    over the rules so that we have a clear

10   understanding and a clean record.  And then if   10:05:05

11   it's okay by your counsel so that we circumvent

12   a lot of the, you know, preliminary questioning

13   like your educational background, and, you

14   know, your work history, we'll just refer back

15   to the other deposition.                       10:05:18

16            And then if you want to make any

17   additions to anything you testified to back in

18   January, you may do so, so that we have a clean

19   record, but, otherwise, if there are no

20   changes, I don't know -- there's no reason for   10:05:27

21   us to go over that and hash that out again; is

22   that fair enough?

23        A.    Yes.

24        Q.    Okay.  So one of the main rules --

25   as it probably happened to you in January and   10:05:39

Page 62

Exhibit 2

1    February of last year, you know, in probably a

2    week or two, you're going to get a booklet,

3    like the one Mr. Kaminski has in front of him,

4    where the transcript of today's deposition will

5    be presented to you.  It's kind of like in a          10:05:49

6    play format, question/answer, question/answer,

7    and you're going to get an opportunity to make

8    any changes that you see to your testimony.

9              But if you make any material

10   changes, any counsel -- or anybody can make           10:05:59

11   light of that and then challenge your

12   credibility later at trial or other hearings;

13   is that understood?

14        A.    Yes.

15        Q.    Okay.  Now, one of the things that          10:06:12

16   we do as human beings is we anticipate each

17   other's questions and answers and so we cut

18   each other off, but the lady to your left, the

19   court reporter, as good as she is at her job,

20   she can only transcribe one person speaking at        10:06:24

21   any one time.

22              So if you do exactly what you're

23   doing right now and wait for me to completely

24   finish my question, then you'll answer and I'll

25   try and reciprocate that courtesy.  Is that           10:06:35

                                                    Page 63

Exhibit 2

1    fair enough?

2         A.    Yes, sir.

3         Q.    Okay.  In the same vein, as human

4    beings, we gesture a lot, we shrug our

5    shoulders or go uh-huh or huh-uh, but,                10:06:43

6    obviously, that cannot be articulated in a

7    transcript.  So if you can, you know,

8    articulate in yes, no, and full sentences, then

9    we'll have a clean record.  Fair enough?

10        A.    Yes.                                         10:06:55

11        Q.    One of the most important questions

12   for today -- I'm sorry, rules for today is if

13   you don't understand a question, just let me

14   know and I'll try and rephrase it.  That will

15   probably happen frequently, but if you do          10:07:07

16   answer a question, I'm going to presume that

17   you understood the question.  Fair enough?

18        A.    Yes.

19        Q.    Okay.  If at any point you want a

20   break, you want to speak to Mr. Kaminski, not a    10:07:13

21   problem, just say so and we'll take a break.

22   Okay?

23             Is there any reason why you can't

24   give me your best testimony today?

25        A.    No.                                          10:07:24

Page 64

Exhibit 2

1        Q.     You're not under any medication or
2    anything like that?

3        A.     No.

4        Q.     Okay.  And I think we talked about
5    this last time, do you understand the                    10:07:33
6    difference between a guess and an estimate?

7        A.     Let's review that.

8        Q.     Let's review that.  Okay.  So,
9    generally speaking, I'm entitled to your best
10   estimate.  Usually that entails numbers, like,          10:07:43
11   you know, speed, distances, and things like
12   that.  And when you make -- when you make an
13   estimate, it's something that you have personal
14   knowledge of.

15            So, you know, the analogy that all             10:07:54
16   lawyers use in a deposition is if I ask you
17   how long this table is right now, the
18   conference table, you have personal knowledge
19   of it, you've seen this table and through your
20   life experiences, you can, you know, give me a          10:08:07
21   good estimate of how long this table is.

22            If I ask you, on the other hand,
23   how long the coffee table is in my living room,
24   you would be guessing because you've never seen
25   it and you don't even know if I have a coffee           10:08:16

                                              Page 65

Exhibit 2

```
 1    table, right?

 2         A.    Right.

 3         Q.    Okay.  So you understand the

 4    difference?

 5         A.    Yes.                            10:08:21

 6         Q.    All right.  So that all said and

 7    done, I'm going to refer back -- let's talk

 8    about your -- actually, strike that.  I

 9    apologize.

10              In preparation for today's        10:08:36

11    deposition, apart from Mr. Kaminski or any of

12    your attorneys, have you spoken with anybody

13    else in preparation for today's deposition?

14         A.    No.

15         Q.    Okay.  Documentation -- is there  10:08:45

16    any documentation that you have reviewed in

17    preparation for today's deposition?

18         A.    No.

19         Q.    Okay.  So going back to your

20    January deposition, has your job -- your       10:08:59

21    employment -- sorry, your employment status --

22         A.    I apologize.  I apologize.  In

23    terms of reviewing documents --

24         Q.    Yes.

25         A.    -- to correct that, I did review   10:09:09
```

Page 66

Exhibit 2

```
 1    the copies I had of the deposition, from the
 2    prior deposition.
 3         Q.    Oh, okay.  And, actually, that
 4    reminds me.  I've prepared Exhibit 1, and I'll
 5    show Mr. Kaminski.  It's a notice of              10:09:22
 6    deposition.
 7                  -  -  -  -  -
 8              (Thereupon, Deposition Exhibit 1,
 9              Notice of Deposition, was marked for
10              purposes of identification.)
11                  -  -  -  -  -
12         Q.    Have you seen that document before?
13         A.    Yes.
14         Q.    And there are categories in that
15    document that you've been asked to be the --     10:09:30
16    what we call the 30(b)(6), the person most
17    qualified from your company to respond to
18    questioning on those topics.
19         A.    Yes.
20         Q.    Are you the best person from          10:09:40
21    Comenity to answer those questions on those
22    topics?
23         A.    Yes.
24         Q.    Okay.  And talking of Comenity --
25    so let's enter that exhibit as 1.               10:09:50
```

Page 67

Exhibit 2

```
 1              I remember last time in your
 2   deposition, you said you actually work for
 3   Alliance Data; is that correct?
 4        A.    Yes.
 5        Q.    Which is the parent company of      10:09:59
 6   Comenity?
 7        A.    Yes.
 8        Q.    And is that still your employer?
 9        A.    Yes.
10        Q.    Okay.  Now, your job title, is it   10:10:04
11   still the same as when you testified in
12   January?
13        A.    Slightly different.
14        Q.    Okay.
15        A.    It's -- it was strategy analytics   10:10:15
16   manager.  It's now senior strategy analytics
17   manager.
18        Q.    Congratulations.  You got a
19   promotion?
20        A.    Yes.                                10:10:24
21        Q.    So are there any job duties that
22   are different than what you already described
23   in January?
24        A.    No.
25        Q.    You just have a better title?      10:10:29
```

                                        Page 68

                                        Exhibit 2

1        A.    Yes.

2        Q.    I like it.  Not that it's any of my

3    business, I hope you're getting compensated

4    better too.

5              So that all said and done, are        10:10:40

6    there anything -- is there anything that's

7    changed, as far as your job duties or your job

8    title, as to what we went over in January?

9        A.    No.

10       Q.    Okay.  Your educational background,    10:10:51

11   has anything changed since January?

12       A.    No.

13       Q.    You haven't enrolled in a Ph.D.

14   program or anything?

15       A.    No, sir.                                10:10:58

16       Q.    So we're done with that, too.

17             MR. KAZEROUNIAN:  So that we are

18   clear, Mr. Kaminski, we can rely on the prior

19   testimony from the January transcript on those

20   background questions?                            10:11:07

21             MR. KAMINSKI:  Yes.

22             MR. KAZEROUNIAN:  Okay.

23       Q.    Now, one thing that I just wanted

24   to clarify, before we get into the nitty-gritty

25   of today's deposition, is that you testified in  10:11:20

                                              Page 69

Exhibit 2

1    January that the only time a dialer is used to

2    make calls, for at least the period of time

3    that we're concerned with, which is from August

4    of 2010 until May -- end of May of 2014, for

5    collection purposes and on very few                10:11:38

6    circumstances for, like, you know, emergencies,

7    like fraud or like in breaches of security,

8    correct?

9         A.    Correct.

10        Q.    There's no other reason -- nothing     10:11:47

11   has changed as to the reason of using a dialer?

12        A.    Nothing has changed.

13        Q.    Okay.  Now, since we met each other

14   last in January, Mr. Kaminski and I have been

15   negotiating, and the class definition has         10:12:01

16   slightly changed.  Are you aware of the new

17   class definition?

18        A.    Can you -- in terms of dates or in

19   terms of --

20        Q.    Well, actually, really what I was       10:12:12

21   getting at is the dates.  The period of time in

22   question.  Are you aware of that?

23        A.    Yes, sir.

24        Q.    And what do you believe it is?

25        A.    August of 2010 to May 26, 2014.         10:12:21

Veritext National Deposition & Litigation Services
866 299-5127

Exhibit 2

1      Q.     Excellent.  So I guess the primary

2   question, which is probably the first topic on

3   the deposition notice, is:  To your

4   understanding, how many people are -- make up

5   the class for the class period?                    10:12:46

6           A.     Approximately, 4.3 million.

7           Q.     4.3 million.  Okay.

8                  Now, in your discovery -- written

9   discovery responses, I believe you stated 4.4

10  million.  I mean, I know we're approximating,    10:13:02

11  but 100,000 is 100,000.  So is it that just

12  like you're remembering off the top of your

13  head and saying 4.3, rather than 4.4, or has

14  anything changed?

15              MR. KAMINSKI:  For clarity's sake,    10:13:18

16  I believe that in the interrogatory responses,

17  I believe that it said up to potentially 4.4

18  million.

19              MR. KAZEROUNIAN:  You know better

20  than me.  I think we should be clear on this.    10:13:31

21              MR. KAMINSKI:  And we will.

22          Q.     It says, "Responding party believe

23  that the number of unique cell phone numbers

24  called during the period of August 1, 2010

25  through May 26, 2014 is approximately 4.4        10:13:52

Exhibit 2

```
 1    million."
 2         A.    That is correct.
 3         Q.    Okay.  So -- I mean, you're
 4    entitled to change your mind.  You're only
 5    100,000 out of 4.4 million.  Is that your final    10:14:12
 6    answer?  Would you like to call a friend?  No.
 7    I just want to be -- I don't want to be cute.
 8    I just really -- for the sake of the regard, we
 9    need to have as specific number as possible.
10    So is it 4.4?                                      10:14:26
11              MR. KAMINSKI:  Can we go off the
12    record a moment?
13              MR. KAZEROUNIAN:  Yeah, of course.
14              (Discussion held off record.)
15         Q.    Okay.  So, Mr. Gervais, would it be     10:16:20
16    fair to say that the actual number is between
17    4.3 and 4.4 million?
18         A.    Yes --
19         Q.    And that's -- I apologize for
20    cutting you off.  That's why we have a            10:16:37
21    discrepancy?
22         A.    Yes.
23         Q.    And how did you come up with --
24    well, actually strike that.
25              The -- one of the main reasons          10:16:46
```

Page 72

Exhibit 2

```
 1    we're having a deposition today is because in

 2    January, you mentioned to me that you have zero

 3    data for anything that is prior to September of

 4    2012; is that correct?

 5           A.    Can I have a minute?              10:17:02

 6           Q.    Of course.  Let's go off the

 7    record.

 8                 (Discussion held off record.)

 9           Q.    So, yeah, when we talked in

10    September -- I'm sorry, in January of this year    10:17:43

11    -- and you mentioned that there's no data prior

12    to September of 2012, but, subsequently, Mr. --

13    you know, your company and my clients have

14    negotiated a settlement that goes prior to

15    September 2012.                                    10:17:58

16                 So I guess my question to you is

17    where are you -- are you -- where are you

18    getting your data from, as it pertains to

19    August of 2010 to September of 2012?

20           A.    Our collection activity tables.       10:18:10

21           Q.    Okay.  So can you expand on that

22    and explain to me how you're getting the data?

23           A.    We're querying those tables -- the

24    collection activity table resides in EWD, and

25    we query those to get number of phone calls       10:18:27
```

Exhibit 2

1    made.

2         Q.    Okay.  So you have your collection

3    software, which is ESW or something -- what's

4    your software called?

5         A.    It's proprietary.  It's called          10:18:41

6    Collection Web.

7         Q.    Okay.  So you have Collection Web,

8    and then you can run a search that shows who

9    was then delinquent during that period?

10        A.    Yes.                                      10:18:53

11        Q.    Okay.  So using that proxy, you can

12   see who was called, correct?

13        A.    Yes.

14        Q.    So you first have -- you first have

15   to run a search to see who is delinquent; is     10:19:02

16   that right?

17        A.    No.

18        Q.    Okay.  So explain the system to me.

19        A.    I run a query for all the calls

20   coded on the collection activity table.          10:19:13

21        Q.    And how do you know which calls

22   were in the dialer and which ones were not?

23        A.    Not one hundred percent sure which

24   ones were dialer and which ones were not.

25        Q.    So how did you come up with a cost    10:19:26

Page 74

Exhibit 2

1    number?  What system did you use?  What

2    process?

3          A.    We collect -- we query the

4    Collection Web table to get phone calls made.

5          Q.    Okay.                              10:19:37

6          A.    We then send those -- that list of

7    phone calls made to an outside consultant to

8    get the phone calls made to mobile phones.

9          Q.    Okay.  So they probably used

10   NEWSTAR or something like that, but the        10:19:52

11   universe that you started with was just anyone

12   that you coded, that they got a call?

13         A.    Yes, sir.

14         Q.    But were these only with delinquent

15   accounts?                                      10:20:05

16         A.    Yes.

17         Q.    Okay.  Now -- because where I was

18   going with that line of questioning is how do

19   you know most of those people got called by a

20   dialer but by the mere fact that they were put 10:20:12

21   in a dialer -- and I don't want to put words in

22   your mouth -- going back to your January

23   testimony, you said that anyone that was

24   delinquent would have been put in the dialer as

25   a process?                                     10:20:22

                                      Page 75

1          A.     Yes.

2          Q.     So would it be fair to say that

3     more than fifty percent of those people would

4     have definitely been put in the dialer?

5          A.     Yes.                              10:20:30

6          Q.     More than sixty percent?

7          A.     Yes.

8          Q.     More than seventy percent?

9          A.     Yes.

10         Q.     More than eighty percent?         10:20:35

11         A.     Yes.

12         Q.     More than ninety percent?

13         A.     Yes.

14         Q.     More than ninety-five percent?

15         A.     Yes.                              10:20:41

16         Q.     Okay.  Perfect.

17                And that is based upon the -- the

18    policy and the procedures in place at Comenity

19    and when the dialer is used with delinquent

20    accounts on the telephone numbers, correct?    10:20:55

21         A.     Correct.

22         Q.     And --

23                MR. KAMINSKI:  And let's just

24    clarify that you're talking about the period

25    August 1st '10 through August 31st, 2012.       10:21:02

Page 76

1          MR. KAZEROUNIAN:   Absolutely.

2    That's the period we're talking about.

3          Q.    Because subsequent to that, it's

4    easier because you have dialer records, because

5    you testified to that in January, right?          10:21:12

6          A.    Yes, sir.

7          Q.    So you run a search on your

8    proprietary system -- and I'm just recapping

9    here -- and all delinquent accounts you find --

10   that in that period of time, you find all calls   10:21:25

11   made that are coded, and then you -- and then

12   because we know that they're delinquent and

13   because there's over ninety-five percent

14   possibility that those numbers were put into a

15   dialer, you can presume that they would fit       10:21:41

16   within the class category -- the class

17   definition.  And so the only thing left to do

18   would be to segregate the cell phone numbers

19   from the landline numbers, correct?

20         A.    Correct.                              10:21:53

21         Q.    And then the next step is you send

22   it to your third-party vendor who scrubbed

23   these and segregated only the cell phone

24   numbers, correct?

25         A.    Correct.                              10:22:01

Page 77

Exhibit 2

1      Q.    Okay.  Now, there's only one more

2   piece to that puzzle that I need to come full

3   loop on, which is how do you know who was in

4   the Picchi class, which is the -- the wrong

5   call account and who was not?                    10:22:13

6      A.    During that process you just

7   described, we excluded any call that was

8   terminated as a wrong number.

9      Q.    Right.  Now, I remember in January,

10  you said that the Picchi class, which is the     10:22:27

11  Florida class action on the wrong party calls,

12  were premised on coded -- on wrong party calls,

13  correct?

14     A.    Correct.

15     Q.    Is that coding in your software?        10:22:42

16  Is it proprietary software, or is it only on

17  the dialer?

18     A.    It's in both.

19     Q.    Okay.  So, therefore, you did have

20  data for the coding -- going back before         10:22:49

21  September 2012 on the wrong party coding?

22     A.    Yes.

23     Q.    Okay.  So you scrubbed that

24  in-house?

25     A.    Yes.                                     10:22:59

                                          Page 78

Exhibit 2

```
 1           Q.     And your software is capable of
 2    doing that?
 3           A.     Yes, sir.
 4           Q.     Okay.  And that scrubbing process
 5    is probably over ninety-nine percent accurate?     10:23:08
 6           A.     Yes.
 7           Q.     Okay.
 8                  MR. KAMINSKI:   Late objection.
 9    Calls for speculation, but I'll let the witness
10    testify and let his answer stand.                  10:23:17
11           Q.     So in compiling the data for the
12    August 1st, 2010 to August 31st, 2012, are you
13    confident that we have all the calls that were
14    made to cell phones that would fit within this
15    class definition?  Is there anything else that     10:23:38
16    we could have possibly missed?
17           A.     Yes, I'm confident.
18           Q.     Okay.  So in coming up with the
19    total universe of numbers for the class
20    definition from August of 2010 to end of May       10:23:51
21    2014, you actually have to add up two separate
22    sets of numbers, correct, because you have to
23    do two type of searches, am I right?
24           A.     Correct.
25           Q.     Okay.  We went over the way that     10:24:03
```

                                                    Page 79

Exhibit 2

```
 1    you came up with the numbers for -- 2012 to

 2    2014 in January, and we'll go over that just so

 3    we come full loop, but do you know

 4    approximately how many people are in the August

 5    2010 until August 31st, 2012 group?              10:24:20

 6         A.    Yes, approximately 2.3 million.

 7         Q.    Perfect.  Okay.  So let's go to the

 8    September 2012 to May of 2014.  How did you

 9    come up with the number of people in the class

10    in that period?                                  10:24:42

11              MR. KAMINSKI:  And just for

12    clarity's sake, we're talking about September

13    1st, 2012 through May 26, 2014, correct?

14              MR. KAZEROUNIAN:  Yes, sir.

15         A.    I queried the dialer tables.          10:24:53

16         Q.    You queried the dialer tables?

17         A.    Yes.

18         Q.    And is there some kind of dialer

19    list?

20         A.    Yes.                                   10:25:02

21         Q.    And how did you query it?

22         A.    Using a tool called WinSQL.

23         Q.    Okay.  And what did you do in

24    running a query?

25         A.    I queried for all calls made via      10:25:16
```

Page 80

```
 1    dialing equipment between September of 2012 and

 2    May 26th, 2014.

 3        Q.    So you started with the entire

 4    universe?

 5        A.    Yes, sir.                          10:25:28

 6        Q.    Okay.  So then what did you do?

 7        A.    I excluded the wrong number of

 8    calls.

 9        Q.    Because they were coded?

10        A.    Yes, sir.                          10:25:34

11        Q.    And the coding for the wrong party

12    calls on the dialer had been put into effect

13    from when you started compiling the tables,

14    correct?

15        A.    Yes.                               10:25:43

16        Q.    Which was in September of 2012?

17        A.    Yes, sir.

18        Q.    Okay.  Continue.

19        A.    Once we had that list, we sent it

20    to outside experts, NEWSTAR.                 10:25:51

21        Q.    Right.

22        A.    They scrubbed it for the phone

23    numbers that were mobile phones.

24        Q.    Okay.  And the scrubbing that you

25    did for the wrong party calls, you did that   10:26:05
```

Page 81

Exhibit 2

1    in-house again, correct?

2          A.    Yes.

3          Q.    Did you do that yourself?

4          A.    Yes.

5          Q.    And are you confident that that        10:26:10

6    process was over ninety-nine percent accurate?

7          A.    Yes, sir.

8          Q.    Okay.  So after NEWSTAR sends it

9    back, they send all the cell phone numbers,

10   right?                                             10:26:21

11         A.    Yes, sir.

12         Q.    So in that period of time, the

13   September of 2012 through May 26 of 2014, how

14   many people in that -- in that group?

15         A.    A little more than 2 million.          10:26:31

16         Q.    Okay.  So then you add that group

17   with the group that we previously talked about,

18   which is August 2010 to August 31, 2012, which

19   was 2.3, and then just over two, which gives us

20   the entire class, which is 4.3 -- just over 4.3    10:26:49

21   as you had mentioned previously, right?

22         A.    Yes, sir.

23         Q.    And that is our world?

24         A.    Yes.

25         Q.    Our class?                             10:27:01

                                                    Page 82

1        A.    Yes.

2        Q.    Excellent.  And are you confident

3   that those two groups put together that make up

4   our class are really the class and we haven't

5   left out any numbers outside of that?  Any            10:27:14

6   class members outside of that to a high degree

7   of confidence?

8              MR. KAMINSKI:  Excluding the wrong

9   number of calls from the Picchi class?

10             MR. KAZEROUNIAN:  Yes.  I'm talking         10:27:25

11  about are we confident that we've got anyone

12  that fits within our class definition, which

13  excludes Picchi, which excludes landline calls,

14  you know, and any -- I just want to make sure

15  that we haven't left out any people that would       10:27:37

16  fit into our class on the periphery.

17       A.    Yes, I am confident.

18       Q.    Excellent.

19             Now, these people that make up our

20  class, the 4.3 -- give or take -- million,           10:27:54

21  these include accountholders, and, you know,

22  references and people like that, right?

23       A.    Yes, sir.

24       Q.    Okay.  And where we got -- where we

25  got the data from, which is the -- you know,         10:28:17

Page 83

1   for the one category of people was from the

2   collection software and the other one was from

3   the dialer, that's a closed universe, there's

4   nothing outside of that universe that we should

5   have been extrapolating data from, right?          10:28:30

6           A.    Correct.

7                 MR. KAMINSKI:  And, Mr. Gervais,

8   just remember that if at any time you don't

9   understand a question, you can ask him to

10  rephrase it or just tell him that you don't       10:28:47

11  understand.

12          Q.    Now, did you go through any

13  processes to make sure that any of the people

14  in our class had not given their telephone

15  number or had given some kind of consent,         10:29:04

16  rather than not consent?

17                MR. KAMINSKI:  Objection; vague and

18  ambiguous.

19                Do you understand what he said?

20          A.    I don't understand the question.    10:29:12

21          Q.    Right.  Sure.

22                So, for example --

23                MR. KAZEROUNIAN:  Actually, can we

24  go off the record for a second.

25                (Discussion held off the record.)   10:44:12

                                                      Page 84

Exhibit 2

```
 1          Q.    I think what we were trying to
 2   establish before the break, Mr. Gervais, is how
 3   do we know that the class consists of people
 4   that genuinely did not give consent to be
 5   called and that's why they're in the class?        10:44:26
 6   Did you go through some kind of procedure to
 7   extract people that had given their telephone
 8   numbers to the bank and were permitted to be
 9   called with the dialer?
10          A.    Yes, we did.                           10:44:36
11          Q.    And can you explain that procedure
12   to me, please?
13          A.    We looked at the phone number
14   called and we compared it to the application
15   that was provided, and if the phone number was    10:44:44
16   on the application, the customer had given us
17   consent.
18          Q.    And, therefore, you excluded it?
19          A.    Yes, sir.
20          Q.    And, therefore, the 4.3 million       10:44:55
21   people, give or take, does not include people
22   who had given their telephone numbers on the
23   application, correct?
24          A.    Yes, sir.
25          Q.    Excellent.                            10:45:04
```

Page 85

```
 1              Now, were you able to conduct this
 2   procedure for the August 2010 to August 2012
 3   period?
 4       A.    Yes.
 5       Q.    Because you still had the          10:45:11
 6   applications, correct?
 7       A.    Yes, sir.
 8       Q.    Okay.  Now, how do you know that
 9   some of these people that had given their
10   telephone numbers on the application that      10:45:23
11   you've excluded had not actually sent a cease
12   and desist request and got volitive calls
13   subsequent to that with a dialer?
14       A.    Those customers would not be in the
15   dialer.                                        10:45:39
16       Q.    Why is that?
17       A.    The process which builds the dialer
18   list --
19       Q.    Right.
20       A.    -- excluded those accounts.          10:45:46
21       Q.    Is it because the people that make
22   a cease and desist request get coded some way?
23       A.    Yes, sir.
24       Q.    And so once they get coded, it's
25   like the way that your software works, it makes 10:45:59
```

Page 86

Exhibit 2

1    it impossible for the dialer to pick up anyone

2    to put into the dialer with the telephone

3    number that's been coded "Do not call"?

4         A.    Correct.

5         Q.    And with what degree of certainty        10:46:10

6    does that work?

7              MR. KAMINSKI:   Objection; calls for

8    speculation; vague and ambiguous.

9         Q.    I mean, is it more than ninety-five

10   percent accurate?                                  10:46:20

11        A.    Yes, sir.

12        Q.    More than ninety-nine percent?

13        A.    Yes, sir.

14        Q.    Okay.  Now, we discussed

15   arbitration in the last deposition in January.     10:46:33

16   A lot of the accountholders have arbitration

17   agreements, correct?

18        A.    Yes, sir.

19        Q.    Now, this 4.3 million people --

20   now, if -- I talked to your counsel previously.    10:46:53

21   I think there is actually a specific number --

22   precise number of people, I think, 4,322,812.

23   I'm not expecting you to confirm or deny that,

24   because, obviously, off the top of your head,

25   you probably don't, but there is a specific        10:47:10

                                        Page 87

Exhibit 2

1    number that creates a total -- specific total

2    -- some certain total of the class, correct?

3         A.    Correct.

4         Q.    Now, if and when the court approves

5    the preliminary approval of this class action,        10:47:23

6    your company can give an electronic searchable

7    format to the claims administrator, a list of

8    these people with their addresses, correct?

9         A.    Correct.

10        Q.    And has that list already been           10:47:38

11   compiled?

12        A.    Yes.

13              MR. KAZEROUNIAN:  I'm sorry, can we

14   go off the record.

15              (Discussion held off the record.)         10:49:18

16        Q.    Mr. Gervais, I think we're coming

17   to the end of the deposition, and the reason

18   that that is because I had some testimony from

19   you from January.  With the -- obviously, there

20   are certain things that were clarified today,        10:49:33

21   specifically, you know, how we get the data

22   from August of 2010 to August of 2012.

23              With that exception, would it be

24   fair to say that what you testified to in

25   January stands and can be used in conjunction        10:49:45

Page 88

Exhibit 2

```
 1    with today's testimony?

 2         A.    Yes, sir.

 3         Q.    Okay.  I don't have any further

 4    questions.

 5              MR. KAZEROUNIAN:  Mr. Kaminski?        10:49:52

 6              MR. KAMINSKI:  I don't have any

 7    further questions.

 8              MR. KAZEROUNIAN:  Okay.  So can we

 9    stipulate that within five days, you'll produce

10    the original transcript to Mr. Kaminski's         10:50:04

11    office, and I'll have an electronic format one

12    -- I'll just have a certified copy.

13              But the original goes to Mr.

14    Kaminski's office, and then within seven days

15    thereafter -- it's going to be a very short       10:50:15

16    deposition transcript -- hopefully, sooner than

17    seven days, you can read it, make any changes

18    if you deem fit, and then advise Mr. Kaminski

19    of those changes, who will, in turn, advise me

20    of those changes, if any.                         10:50:29

21              If within that seven days, after

22    Mr. Kaminski's receipt of that transcript, I'm

23    not informed of any changes, it will be

24    presumed that none were made.

25              Mr. Kaminski will keep custody and       10:50:37
```

Page 89

Exhibit 2

1    control of the original transcript and make it

2    available for future hearings and for trial,

3    should it get there, upon reasonable -- and

4    make it available to all other counsel upon

5    reasonable notice.                              10:50:48

6            If the original is lost or

7    misplaced, a certified copy can be used in its

8    place for future hearings and trial.

9            MR. KAMINSKI:  So stipulated.

10           MR. KAZEROUNIAN:  Mr. Gervais,          10:51:02

11   thank you very much for your time.

12           THE WITNESS:  Thank you.

13           (Thereupon, the deposition was

14   concluded at 10:51 a.m.)

15

16

17

18

19

20

21

22

23

24

25

Veritext National Deposition & Litigation Services
866 299-5127

Exhibit 2