# EXHIBIT E

*Excerpts from the transcript for the deposition of Daniel Gevais*

---

## In The Case Of

### Carrie Couser, Individually and on Behalf of All Others Similarly Situated,

### v.

### Comenity Bank

### 3:12-cv-02484-MMA-BGS

```
 1          IN THE UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF

 3                     CALIFORNIA

 4     ---------------------------------

 5     CARRIE COUSER, INDIVIDUALLY AND ON

 6     BEHALF OF ALL OTHERS SIMILARLY

 7     SITUATED,

 8               Plaintiffs, Case No.  3:12-CV-02484

 9        vs.                    MMA-BGS

10     COMENITY BANK,

11               Defendant.

12     ---------------------------------

13

14               Deposition of

15               DANIEL GERVAIS

16             January 21, 2014

17               11:05 a.m.

18        41 South High Street, Suite 210

19               Columbus, Ohio

20     Reported by:

21     Kimberly A. Kaz, RPR, Notary Public

22

23

24

25     PAGES 1 - 56
```

Page 1

1    dialer with those fields or with those numbers

2    to be called by the dialer?

3         A.    The campaign managers do not make

4    that decision.

5         Q.    Who makes that decision?                11:21:32

6         A.    My manager does in conjunction with

7    me and our collections leadership.

8         Q.    Okay.  Now, are those lists or the

9    campaigns that are dialed, are those recorded

10   for -- so that, like, in three months, you want   11:21:50

11   to know what campaign you ran and which

12   telephone numbers were called in three months,

13   is there a record of that?

14        A.    Yes.

15        Q.    And how far back do you have these      11:21:59

16   records?

17        A.    September 2012.

18        Q.    Why is that such a significant

19   date, September?  Why not before?

20        A.    That was when we established our        11:22:09

21   dialer tables to house that information.

22        Q.    So do you not have any data

23   pre-September 2012?

24        A.    No, sir.

25        Q.    Zero data?                              11:22:21

Page 23

1        A.    No, sir.

2        Q.    Have you looked for any data?

3        A.    Yes.

4        Q.    And the outcome was negative?

5        A.    Correct.                              11:22:28

6        Q.    Did you use a different dialing

7   system before September 2012?

8        A.    Yes, sir.

9        Q.    And what happened to those dialers

10  that you were using pre-September 2012?         11:22:37

11       A.    I do not know where those dialers

12  are.

13       Q.    Who would know?

14       A.    Todd Prince might know.

15       Q.    Can you spell his name, please?      11:22:49

16       A.    First name Todd, T-o-d-d.

17       Q.    Yeah.

18       A.    Last name Prince, P-, as in "Paul,"

19  -r-i-n-c-e.

20       Q.    Okay.  And what is his title,        11:23:00

21  Mr. Prince's title?

22       A.    I do not know.

23       Q.    Okay.  Is he still at the entity?

24       A.    Yes, sir.

25       Q.    And is he at the same corporate     11:23:08

                                        Page 24

1    we're talking about again.

2            So the predominant members of the

3    class are accountholders who have defaulted at

4    some point, correct?

5        A.    Yes.                                    11:40:05

6        Q.    Now, actually, in the application

7    process, are accountholders asked to put down

8    third-party contact names?  For example, you

9    know, if you're opening up an account,

10   sometimes you're asked to write down, like,      11:40:23

11   give me a secondary contact, like, if somebody

12   gives their brother's name with a telephone

13   number.  Does that happen?

14           MR. KAMINSKI:  Okay.  Calls for

15   speculation.  Lacks foundation.                   11:40:31

16           THE WITNESS:  Yes, sir.

17       Q.    And are some of these people that

18   were called third parties within our class,

19   within the Couser class?

20       A.    Yes.                                     11:40:45

21       Q.    Like references as well, maybe?

22           MR. KAMINSKI:  Objection.  Calls

23   for speculation.

24           THE WITNESS:  That could be that,

25   yes.                                              11:41:03

                                          Page 38

```
 1         Q.    Cosigners?

 2         A.    Yes, sir.

 3         Q.    So there are people in the class

 4    that -- whose addresses we may not have on

 5    accounts at Comenity; is that correct?          11:41:17

 6         A.    Yes, sir, in the case of cosigners.

 7         Q.    Or third-party contacts?

 8         A.    Right.

 9         Q.    Now, what percentage, to the best

10    of your estimation, of the class do we have      11:41:34

11    addresses for and which ones don't we have

12    addresses for?  Like, if you had to estimate

13    the percentage.

14         A.    I'd have to guess.

15         Q.    I don't want you to guess.           11:41:45

16         A.    So I don't know.

17         Q.    Is it more than 50 percent we have

18    addresses for?  Do you know that much?

19         A.    Yes, sir.

20         Q.    More than 70 percent?                11:41:52

21         A.    Yes.

22         Q.    More than 80 percent?

23         A.    Yes.

24         Q.    More than 90?

25         A.    Yes.                                 11:41:58
```

                                              Page 39

1    Q.    More than 95?

2    A.    Yes.

3    Q.    Is that where it starts getting a

4    little bit unsure?

5    A.    Yes.                              11:42:04

6    Q.    But it's definitely more than 90?

7    A.    Yes.

8    Q.    Okay.  Now, do all accountholders

9    have arbitration clauses in their contacts,

10   credit card contracts?                  11:42:17

11         MR. KAMINSKI:  Objection.  Calls

12   for speculation.

13         THE WITNESS:  I do not know.

14   Q.    You don't know?

15         MR. KAZEROUNIAN:  Can I have a     11:42:29

16   quick second?

17         MR. KAMINSKI:  Sure.

18         (Recess taken.)

19   Q.    Mr. Gervais, your customers at

20   Comenity, do you usually get consent to call   11:46:09

21   them with an auto dialer?

22   A.    Yes.

23   Q.    And how many different ways, to the

24   best of your knowledge, do you get consent to

25   call your clients on an auto dialer?       11:46:23

                                        Page 40

```
 1                    MR. KAMINSKI:  Objection with

 2     respect to the phrase "auto dialer."  Vague and

 3     ambiguous.  Lacks foundation.

 4                    THE WITNESS:  Do you want to know

 5     the number of ways or the different ways?        11:46:35

 6          Q.    I'm asking the same thing.  Give me

 7     a list, and we'll go through them.

 8          A.    So we can get them from

 9     applications.

10          Q.    Okay.                                11:46:45

11          A.    Which can be online, in the store,

12     et cetera.

13          Q.    Well, let's not do et cetera.  I

14     want as many as possible.

15          A.    Okay.                                11:46:53

16          Q.    You tell me all the different

17     application forms you know.  So we got online,

18     in store.

19          A.    Online, in store, mailed.

20          Q.    Okay.                                11:47:03

21          A.    That's the only application sources

22     I know of.

23          Q.    Okay.  Fax?

24          A.    I'm not aware of fax.

25          Q.    E-mail?                              11:47:17
```

Page 41

1          A.     Not aware of e-mail applications.

2          Q.     Okay.  Carry on.

3          A.     The customer can give us their

4     phone number through our website.

5          Q.     Okay.                              11:47:26

6          A.     They can call in to us, to our

7     customer service department.

8          Q.     So orally?

9          A.     Yes.

10         Q.     By phone?                          11:47:39

11         A.     Yes.

12         Q.     Okay.

13         A.     So the different versions of orally

14    are they call us, or if we call them through

15    a -- and talk to them for collections and they   11:47:52

16    give us other phone numbers that we can call

17    them on.

18         Q.     Do you have a policy where the

19    first call is made by a landline, let's say?

20         A.     No.                                11:48:04

21         Q.     So if it goes to collections, it

22    just gets loaded up into the dialer?

23              MR. KAMINSKI:  Objection.  Vague

24    and ambiguous.

25              THE WITNESS:  Only numbers that we    11:48:11

Page 42

```
 1    have consent to call through the dialer do we
 2    load into the dialer.
 3         Q.    Now, in the contract or in the
 4    application, does it say, "By you giving us
 5    this telephone number, you're giving us consent    11:48:21
 6    to call you with an auto dialer?"  Does it have
 7    language to that effect?
 8         A.    I'm informed it does.
 9         Q.    Who informed you of that?
10         A.    Our company attorneys.                  11:48:32
11         Q.    Don't ever tell me about what your
12    attorneys tell you.  I don't want to know about
13    that.
14         A.    Okay.
15         Q.    Have you ever actually seen the        11:48:38
16    contract yourself?
17         A.    Yes, I have.
18         Q.    And you've seen that language?
19         A.    I've seen that language.
20         Q.    Okay.  And that's a standard           11:48:58
21    language?
22         A.    Yes.
23         Q.    Okay.  So in that same contract,
24    you don't remember if there's an arbitration
25    clause in there?                                   11:49:05
```

                                           Page 43

1      A.    I'm informed there are --

2      Q.    Okay.

3      A.    -- arbitration clauses.  I don't

4  recall.

5      Q.    Okay.  So if it is in there,          11:49:14

6  the -- that would be standard for all the

7  customers, right?

8      A.    Yes, sir.  That's what I'm

9  informed.

10      Q.    Okay.  So let's go through the        11:49:23

11  answer.  Online, so somebody can just go online

12  to get a line of credit with Comenity, and they

13  can give that telephone number online?

14      A.    Yes.

15      Q.    They could be at the Gap store or     11:49:35

16  Old Navy, and they're doing it right there, and

17  they write in their telephone number in the

18  application and then mail it in, right?

19      A.    Yes.

20      Q.    Or you could obviously do it by       11:49:46

21  mail where you send it to them and same

22  variation thereof, I guess?

23      A.    Yes.

24      Q.    Or they can go to your website and

25  give consent that way?                          11:49:56

                                          Page 44

```
 1        A.    Yes.

 2        Q.    And you can obviously, like, if

 3   they call in, you could ask -- you sometimes

 4   ask orally whether you can use a dialer, right?

 5        A.    Yes.                              11:50:06

 6        Q.    And also, on top of that, you have

 7   language in your contract?

 8        A.    Yes.

 9        Q.    Okay.  And you believe there's an

10   arbitration clause as well?                  11:50:11

11        A.    I'm informed, yes.

12        Q.    Okay.  But you've actually seen the

13   language regarding dialer, but you haven't seen

14   the language regarding the arbitration?

15        A.    Yes, sir.                         11:50:23

16        Q.    Okay.  But, obviously, the third

17   parties -- you know, we're talking about

18   references or, like, a secondary number or

19   something, it's usually the applicant that puts

20   that number down, not the third party          11:50:37

21   themselves, correct?

22        A.    Correct.

23        Q.    And just to firm this up, we have

24   no data from September 2012 going back,

25   correct?                                      11:50:58
```

                                              Page 45

1          A.    Correct.

2          Q.    It's good news that I'm slowing

3    down.  It means we're almost there.

4               So as you sit here today, you

5    actually are not in possession of an outbound          11:51:30

6    dial list?  The third party has it, right, an

7    outbound dial list of all the cell phones that

8    were called from September 2012 to the present

9    date?

10              MR. KAMINSKI:  Do you understand          11:51:43

11   the question?  He's asking if you have

12   possession.

13              THE WITNESS:  I do not have

14   possession of that list.

15        Q.    And to the best of your belief, is          11:51:50

16   that in the possession of a third-party expert?

17        A.    Yes, sir.

18              MR. KAZEROUNIAN:  Now,

19   Mr. Kaminski, while we're on the record, can we

20   agree that and for the purposes of preliminary          11:52:01

21   approval papers, you'll supply me with some

22   kind of declaration from the third party

23   regarding the exact number of calls that were

24   scrubbed?

25              MR. KAMINSKI:  I will take this          11:52:10

Page 46

```
 1    issue up under advisement and speak with my

 2    client.

 3              MR. KAZEROUNIAN:  Okay.  So we'll

 4    meet and confer maybe within --

 5              MR. KAMINSKI:  We'll meet and          11:52:17

 6    confer further.

 7              MR. KAZEROUNIAN:  Okay.

 8         Q.    And the only database that you

 9    searched in order to provide data to whoever

10    the data was provided to was the dialer          11:52:37

11    records, right?

12         A.    Yes, sir.

13         Q.    Did you have to -- when you were

14    going through the dialer records, did you have

15    to do any further search criteria in order to    11:52:57

16    get the data that you needed, or did you get

17    just the raw data from September 2012 to the

18    present day and just handed it over?

19         A.    I just got the raw data from the

20    phone numbers called from September '12 forward  11:53:08

21    and handed it over.

22         Q.    Is there anything else that you

23    looked at or mined in order to give to the --

24         A.    The only other criteria was what we

25    talked about before, I excluded wrong numbers    11:53:27
```

Page 47

```
 1          IN THE UNITED STATES DISTRICT COURT

 2        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   CARRIE COUSER, INDIVIDUALLY

 5   AND ON BEHALF OF ALL OTHERS

 6   SIMILARLY SITUATED,

 7              Plaintiffs,

 8        vs.                   Case No.

 9   COMENITY BANK,            3:12-CV-02484-MMA-BGS

10              Defendant.    VOLUME II

11   _____

12

13

14

15        Continued Deposition of DANIEL GERVAIS,

16        taken at 41 South High Street, Columbus,

17        Ohio, commencing at 10:04 a.m., Thursday,

18        August 21, 2014, before Rebecca Williams,

19        RPR, Notary Public.

20

21

22

23

24   JOB No. 1885285

25   PAGES 57 - 93
```

Page 57

```
 1    million."

 2          A.    That is correct.

 3          Q.    Okay.  So -- I mean, you're

 4    entitled to change your mind.  You're only

 5    100,000 out of 4.4 million.  Is that your final    10:14:12

 6    answer?  Would you like to call a friend?  No.

 7    I just want to be -- I don't want to be cute.

 8    I just really -- for the sake of the regard, we

 9    need to have as specific number as possible.

10    So is it 4.4?                                      10:14:26

11          MR. KAMINSKI:  Can we go off the

12    record a moment?

13          MR. KAZEROUNIAN:  Yeah, of course.

14          (Discussion held off record.)

15          Q.    Okay.  So, Mr. Gervais, would it be    10:16:20

16    fair to say that the actual number is between

17    4.3 and 4.4 million?

18          A.    Yes --

19          Q.    And that's -- I apologize for

20    cutting you off.  That's why we have a             10:16:37

21    discrepancy?

22          A.    Yes.

23          Q.    And how did you come up with --

24    well, actually strike that.

25                The -- one of the main reasons         10:16:46
```

Page 72

```
 1    we're having a deposition today is because in
 2    January, you mentioned to me that you have zero
 3    data for anything that is prior to September of
 4    2012; is that correct?
 5         A.    Can I have a minute?                    10:17:02
 6         Q.    Of course.  Let's go off the
 7    record.
 8              (Discussion held off record.)
 9         Q.    So, yeah, when we talked in
10    September -- I'm sorry, in January of this year   10:17:43
11    -- and you mentioned that there's no data prior
12    to September of 2012, but, subsequently, Mr. --
13    you know, your company and my clients have
14    negotiated a settlement that goes prior to
15    September 2012.                                    10:17:58
16              So I guess my question to you is
17    where are you -- are you -- where are you
18    getting your data from, as it pertains to
19    August of 2010 to September of 2012?
20         A.    Our collection activity tables.        10:18:10
21         Q.    Okay.  So can you expand on that
22    and explain to me how you're getting the data?
23         A.    We're querying those tables -- the
24    collection activity table resides in EWD, and
25    we query those to get number of phone calls       10:18:27
```

Page 73

1   made.

2        Q.    Okay.  So you have your collection

3   software, which is ESW or something -- what's

4   your software called?

5        A.    It's proprietary.  It's called          10:18:41

6   Collection Web.

7        Q.    Okay.  So you have Collection Web,

8   and then you can run a search that shows who

9   was then delinquent during that period?

10       A.    Yes.                                      10:18:53

11       Q.    Okay.  So using that proxy, you can

12   see who was called, correct?

13       A.    Yes.

14       Q.    So you first have -- you first have

15   to run a search to see who is delinquent; is      10:19:02

16   that right?

17       A.    No.

18       Q.    Okay.  So explain the system to me.

19       A.    I run a query for all the calls

20   coded on the collection activity table.           10:19:13

21       Q.    And how do you know which calls

22   were in the dialer and which ones were not?

23       A.    Not one hundred percent sure which

24   ones were dialer and which ones were not.

25       Q.    So how did you come up with a cost      10:19:26

Page 74

1    number?  What system did you use?  What

2    process?

3         A.    We collect -- we query the

4    Collection Web table to get phone calls made.

5         Q.    Okay.                              10:19:37

6         A.    We then send those -- that list of

7    phone calls made to an outside consultant to

8    get the phone calls made to mobile phones.

9         Q.    Okay.  So they probably used

10   NEWSTAR or something like that, but the        10:19:52

11   universe that you started with was just anyone

12   that you coded, that they got a call?

13        A.    Yes, sir.

14        Q.    But were these only with delinquent

15   accounts?                                      10:20:05

16        A.    Yes.

17        Q.    Okay.  Now -- because where I was

18   going with that line of questioning is how do

19   you know most of those people got called by a

20   dialer but by the mere fact that they were put  10:20:12

21   in a dialer -- and I don't want to put words in

22   your mouth -- going back to your January

23   testimony, you said that anyone that was

24   delinquent would have been put in the dialer as

25   a process?                                      10:20:22

Page 75

1       A.      Yes.

2       Q.      So would it be fair to say that

3   more than fifty percent of those people would

4   have definitely been put in the dialer?

5       A.      Yes.                                    10:20:30

6       Q.      More than sixty percent?

7       A.      Yes.

8       Q.      More than seventy percent?

9       A.      Yes.

10      Q.      More than eighty percent?              10:20:35

11      A.      Yes.

12      Q.      More than ninety percent?

13      A.      Yes.

14      Q.      More than ninety-five percent?

15      A.      Yes.                                    10:20:41

16      Q.      Okay.  Perfect.

17              And that is based upon the -- the

18  policy and the procedures in place at Comenity

19  and when the dialer is used with delinquent

20  accounts on the telephone numbers, correct?      10:20:55

21      A.      Correct.

22      Q.      And --

23              MR. KAMINSKI:  And let's just

24  clarify that you're talking about the period

25  August 1st '10 through August 31st, 2012.         10:21:02

Page 76

```
 1          Q.    Okay.  Now, there's only one more
 2    piece to that puzzle that I need to come full
 3    loop on, which is how do you know who was in
 4    the Picchi class, which is the -- the wrong
 5    call account and who was not?                   10:22:13
 6          A.    During that process you just
 7    described, we excluded any call that was
 8    terminated as a wrong number.
 9          Q.    Right.  Now, I remember in January,
10    you said that the Picchi class, which is the    10:22:27
11    Florida class action on the wrong party calls,
12    were premised on coded -- on wrong party calls,
13    correct?
14          A.    Correct.
15          Q.    Is that coding in your software?    10:22:42
16    Is it proprietary software, or is it only on
17    the dialer?
18          A.    It's in both.
19          Q.    Okay.  So, therefore, you did have
20    data for the coding -- going back before        10:22:49
21    September 2012 on the wrong party coding?
22          A.    Yes.
23          Q.    Okay.  So you scrubbed that
24    in-house?
25          A.    Yes.                                10:22:59
```

Page 78

1          Q.    And your software is capable of

2    doing that?

3          A.    Yes, sir.

4          Q.    Okay.  And that scrubbing process

5    is probably over ninety-nine percent accurate?     10:23:08

6          A.    Yes.

7          Q.    Okay.

8                MR. KAMINSKI:  Late objection.

9    Calls for speculation, but I'll let the witness

10   testify and let his answer stand.                  10:23:17

11         Q.    So in compiling the data for the

12   August 1st, 2010 to August 31st, 2012, are you

13   confident that we have all the calls that were

14   made to cell phones that would fit within this

15   class definition?  Is there anything else that     10:23:38

16   we could have possibly missed?

17         A.    Yes, I'm confident.

18         Q.    Okay.  So in coming up with the

19   total universe of numbers for the class

20   definition from August of 2010 to end of May       10:23:51

21   2014, you actually have to add up two separate

22   sets of numbers, correct, because you have to

23   do two type of searches, am I right?

24         A.    Correct.

25         Q.    Okay.  We went over the way that      10:24:03

                                                Page 79

1    you came up with the numbers for -- 2012 to

2    2014 in January, and we'll go over that just so

3    we come full loop, but do you know

4    approximately how many people are in the August

5    2010 until August 31st, 2012 group?                10:24:20

6         A.    Yes, approximately 2.3 million.

7         Q.    Perfect.   Okay.   So let's go to the

8    September 2012 to May of 2014.  How did you

9    come up with the number of people in the class

10   in that period?                                    10:24:42

11              MR. KAMINSKI:   And just for

12   clarity's sake, we're talking about September

13   1st, 2012 through May 26, 2014, correct?

14              MR. KAZEROUNIAN:   Yes, sir.

15        A.    I queried the dialer tables.            10:24:53

16        Q.    You queried the dialer tables?

17        A.    Yes.

18        Q.    And is there some kind of dialer

19   list?

20        A.    Yes.                                     10:25:02

21        Q.    And how did you query it?

22        A.    Using a tool called WinSQL.

23        Q.    Okay.   And what did you do in

24   running a query?

25        A.    I queried for all calls made via        10:25:16

                                                  Page 80

```
 1    dialing equipment between September of 2012 and

 2    May 26th, 2014.

 3         Q.    So you started with the entire

 4    universe?

 5         A.    Yes, sir.                        10:25:28

 6         Q.    Okay.  So then what did you do?

 7         A.    I excluded the wrong number of

 8    calls.

 9         Q.    Because they were coded?

10         A.    Yes, sir.                        10:25:34

11         Q.    And the coding for the wrong party

12    calls on the dialer had been put into effect

13    from when you started compiling the tables,

14    correct?

15         A.    Yes.                             10:25:43

16         Q.    Which was in September of 2012?

17         A.    Yes, sir.

18         Q.    Okay.  Continue.

19         A.    Once we had that list, we sent it

20    to outside experts, NEWSTAR.                10:25:51

21         Q.    Right.

22         A.    They scrubbed it for the phone

23    numbers that were mobile phones.

24         Q.    Okay.  And the scrubbing that you

25    did for the wrong party calls, you did that  10:26:05
```

Page 81

```
 1    in-house again, correct?

 2          A.    Yes.

 3          Q.    Did you do that yourself?

 4          A.    Yes.

 5          Q.    And are you confident that that        10:26:10

 6    process was over ninety-nine percent accurate?

 7          A.    Yes, sir.

 8          Q.    Okay.  So after NEWSTAR sends it

 9    back, they send all the cell phone numbers,

10    right?                                             10:26:21

11          A.    Yes, sir.

12          Q.    So in that period of time, the

13    September of 2012 through May 26 of 2014, how

14    many people in that -- in that group?

15          A.    A little more than 2 million.          10:26:31

16          Q.    Okay.  So then you add that group

17    with the group that we previously talked about,

18    which is August 2010 to August 31, 2012, which

19    was 2.3, and then just over two, which gives us

20    the entire class, which is 4.3 -- just over 4.3    10:26:49

21    as you had mentioned previously, right?

22          A.    Yes, sir.

23          Q.    And that is our world?

24          A.    Yes.

25          Q.    Our class?                             10:27:01
```

Page 82

1        A.    Yes.

2        Q.    Excellent.  And are you confident

3    that those two groups put together that make up

4    our class are really the class and we haven't

5    left out any numbers outside of that?  Any          10:27:14

6    class members outside of that to a high degree

7    of confidence?

8              MR. KAMINSKI:  Excluding the wrong

9    number of calls from the Picchi class?

10             MR. KAZEROUNIAN:  Yes.  I'm talking        10:27:25

11   about are we confident that we've got anyone

12   that fits within our class definition, which

13   excludes Picchi, which excludes landline calls,

14   you know, and any -- I just want to make sure

15   that we haven't left out any people that would     10:27:37

16   fit into our class on the periphery.

17        A.    Yes, I am confident.

18        Q.    Excellent.

19             Now, these people that make up our

20   class, the 4.3 -- give or take -- million,         10:27:54

21   these include accountholders, and, you know,

22   references and people like that, right?

23        A.    Yes, sir.

24        Q.    Okay.  And where we got -- where we

25   got the data from, which is the -- you know,       10:28:17

                                              Page 83